UNITED STATES v. BARKER.

(Circuit Court of Appeals, Third Circuit. February 16, 1900.)

No. 18.

1. POSTMASTERS—ACTION ON BOND—FAILURE TO ACCOUNT FOR MONEY ORDERS.
   It is not essential to support an action on the bond of a postmaster for failing to account for money orders which were made upon blank forms intrusted to him for his use, and which have been paid by the offices on which they were drawn, and in due course charged to his account on the books of the department, that it should be proved that he actually received the money therefor.

2. SAME.
   Under section 1243 of the regulations of the post-office department, which requires postmasters to keep their blank money order forms in their own custody and under lock and key, and states that they will be held responsible for any loss which the department may suffer arising from fraud made possible through a disregard of such regulation, where a postmaster negligently delivers blank orders to a stranger, and they are filled up, the name of the postmaster forged thereon, and they are paid by the offices on which they are drawn, and in due course charged to the account of such postmaster in the books of the department, it becomes his duty to account for such orders, and on his refusal to do so the amount paid thereon may be recovered in an action on his bond.

3. SAME.
   The declaration in an action on a postmaster's bond, conditioned as required by statute for a money-order office, alleged that the postmaster did not perform all of the duties and obligations imposed upon him by the law and the rules and regulations of the post-office department, in that he failed to account for a certain number of money orders of great value, to wit, of a value stated. In support of such declaration, a duly-certified transcript from the books of the department, showing such orders paid and charged to defendant's account, was introduced in evidence, together with proof of demand and refusal to pay the balance thereby shown. In defense evidence was introduced showing that the postmaster's assistant had delivered such orders in blank to a stranger, on his claim that he was an inspector, and that they had subsequently been filled out, and the postmaster's signature thereto forged. *Held*, that such evidence did not establish a variance between the proof and the declaration by showing that the government's cause of action was in tort, and not in contract on the bond, for a failure to account for the orders intrusted to the postmaster's custody, and that the direction of a verdict for defendant on that ground was error.

In Error to the District Court of the United States for the Eastern District of Pennsylvania.

James M. Beck, for the United States.

Richard S. Hunter, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges

GRAY, Circuit Judge. This case comes before the circuit court of appeals upon a writ of error directed to the district court for the Eastern district of Pennsylvania, and issued at the instance of the United States, to reverse a judgment entered upon a verdict for the defendant in error in the court below. The proceeding was an action in assumpsit by the United States against Thomas H. Barker on a bond given by John Breen, as postmaster at Gladwyne, Pa., executed by Breen as principal, and by the defendant and William B. Crawford

as sureties. Separate actions were begun against the postmaster and his sureties, but the three cases were tried together, and counsel have agreed to rest the suits against Breen and Crawford upon the final issue in the present case. The defendants severally pleaded non assumpsit. The government in its statement, which was drawn as long ago as 1895, at the commencement of the suit, averred the execution of the bond, setting it forth in full, and by way of breach alleged that:

"The said John Breen did not faithfully discharge all of the duties and trusts imposed on him either by law or the regulations of the post-office department of the United States, and did not perform all of the duties and obligations imposed upon or required of him by law, or the rules and regulations of the said department in connection with the money-order business, in that heretofore, to wit, upon the 26th day of August, 1893, the said John Breen, in violation of the duties and trusts imposed on him, failed, neglected, and refused to account for a large number of money orders of great value, to wit, of the value of $1,103.93, as aforesaid."

The government first offered in evidence a certified copy of the postmaster's bond executed by John Breen as principal, and Thomas H. Barker and William B. Crawford as sureties, in the sum of $2,500, dated February 16, 1892, and conditioned as follows:

"Now, the condition of this obligation is such that if the said John Breen shall faithfully discharge all the duties and trusts imposed on him, whether by law or the rules and regulations of the post-office department of the United States, and shall also perform all of the duties and obligations imposed upon or required of him by law or the rules and regulations of the said department in connection with the money-order business, then the above obligation shall be void; otherwise, of force."

Under section 889 of the Revised Statutes, the United States attorney further offered in evidence a true and correct transcript from the money-order account books of the post-office department of the account of John Breen, postmaster at Gladwyne, duly certified to by the auditor for the post-office department, showing a balance of $1,103.93 due the government on August 26, 1893, arising by reason of 12 domestic money orders issued during the month of August. The counsel for the government also offered in evidence, under section 890 of the Revised Statutes, the duly-certified copy of the paper on file in the office of the auditor for the post-office department, showing demand made upon John Breen, as postmaster, for the amount of the balance due under the account, on the 13th day of April, 1895, and upon the sureties for the same, on April 16, 1895, and put in evidence a copy of the authorized rules and regulations of the department in force while Breen was postmaster, and, in particular, called the court's attention to sections 459 and 1243. Section 459 of the regulations reads as follows:

"Commissions of Post-Office Inspectors to be Demanded. To avoid impostures, postmasters should always insist upon the exhibition of commissions of persons representing themselves to be post-office inspectors, unless such persons are personally known to them to be such officers. Every post-office inspector carries a commission signed by the postmaster general."

Section 1243 reads:

"Postmasters Responsible for Loss of Money-Order Forms. Postmasters must keep their stock of blank money orders and advice forms in their own custody, under lock and key, in some place of security, to which unauthorized

persons cannot have access, and they will be held responsible for any loss which the department may suffer arising from fraud made possible through a disregard of this regulation."

The defendant's counsel called John Breen, the postmaster, his wife, who acted as assistant postmaster, and Messrs. Barker and Crawford, the two sureties. It appeared from the defendant's evidence that, on or about August 13, 1893, a stranger had called at the Gladwyne post office, and asked for the postmaster. Mr. Breen was not in, having gone to Manyunk to attend to some private business. The stranger told Mrs. Breen that she "would do," and that he was a post-office inspector, and that he wished "the money-order blanks of the office." He stated as his reason that the government was going to dispense with several money-order offices, because there was not enough business done to justify the necessary clerk hire. Seeing that Mrs. Breen hesitated, he handed her a "slip of paper," which appeared to be a "printed form of the United States government, and had on it two signatures," whose she did not remember, although one of them "seemed to be familiar." She had heard of a post-office inspector of the same name. She then went to the safe, and got the money-order book, which happened, as it appeared, to contain exactly 11 blank money-order forms, and gave it to him. She also took out of the safe "the books" and "everything pertaining to the money-order department," but he said "that somebody else would come to look at them." She did not require any receipt for the forms. "He said the government would notify them," and drove away in the buggy in which he had come.

At the defendant's request, the government produced at the trial 11 money orders, numbered, consecutively, 40 to 50, inclusive, purporting to have been issued and to be signed by John Breen, as postmaster, at the Gladwyne post office, August 14, 1893. They were drawn on several different post offices in Rhode Island, and bear the evidence of having been paid by the offices on which they were drawn. Each order appeared to have been paid a day or so after its issuance, and bore the stamp of its paying office, and the receipt of its payee. With these 11 money orders, the defendant offered in evidence eleven "letters of advice," which in number and date and in other particulars corresponded with the money orders. The defendant also offered 39 applications for money orders, which corresponded with the money orders issued by Mr. Breen up to No. 40. It was admitted at the trial that the signatures of the postmaster on the 11 money orders numbered 40 to 50 were forged. It was also shown that the stamp of the Gladwyne post office on these 11 money orders was slightly different from the genuine stamp. The 11 money orders were for $100 each, and corresponded in amount with the charge made in the account, and for which the government had asked a reimbursement. The postmaster himself admitted that in other respects the account as stated by the department was correct, and that the $1,103.93, the amount sued for, had evidently reference to the 11 money orders in evidence, the fees and commissions on the same making up the $3.93 additional. The rest of the defendant's evidence went to other questions, which did not affect the case.

At the close of defendant's testimony, the plaintiff offered certain points for the consideration of the court. After hearing argument on both sides, the learned judge of the court below charged the jury as follows:

"Under my view of the case, it will be unnecessary for me to pass upon the plaintiff's points. The stenographer will take the charge down, noting an exception for the plaintiff. The government's statement puts its case upon the failure of the postmaster to account, the precise language being: 'In violation of the duties and trusts imposed upon him, failed, neglected, and refused to account for a large number of money orders of great value, to wit, of the value of $1,103.93, as aforesaid.' That being the charge, and it appearing by the evidence, and by the concession of the government, that the postmaster never had the money in his hands represented by these orders, but that the government's case rests upon an alleged failure of duty either imposed by statute or by regulation,—in other words, upon an alleged tort said to have been committed by the defendant,—the court is of opinion that there is a fatal variance between the proof and the allegation, and therefore there must be a verdict for the defendants in each of these cases. The jury is so instructed accordingly."

Exceptions were duly taken to this charge by the counsel for the government, and a bill of exceptions duly signed, and upon a writ of error the cause is before this court for review. Of the several assignments of error, only the last need be referred to, which alleges that the judge erred in charging the jury as above set forth. This raises the question whether there was a material variance between the plaintiff's allegations in his statement of case and the proofs at the trial. In the conduct of the money-order business, blank forms for money orders are delivered by the post-office department to money-order postmasters, carefully numbered, and charged to their account. No money orders can be issued except by the use of these forms, and none others would be paid. Their value, and the importance of their being safely kept, are obvious; hence the regulation of the post-office department, which may be again quoted, as follows:

"Postmasters must keep their stock of blank money orders and advice forms in their own custody, under lock and key, in some place of security, to which unauthorized persons cannot have access, and they will be held responsible for any loss which the department may suffer arising from fraud made possible through a disregard of this regulation."

This regulation prescribes one of the duties of a postmaster for the performance of which he gives bond. The duty thereby imposed is an absolute one, and its breach undoubtedly would constitute a forfeiture of the obligation of the bond. In this case, the violation of this clearly-prescribed duty rests upon evidence which is not disputed; indeed, upon the testimony produced by the defendant himself. It is that a totally unauthorized person appeared at the post office in the absence of the postmaster, and induced his wife, who was his assistant, by the artifice and deception hereinbefore stated, to deliver up to him the post-office blanks, 11 in number, which it appears were afterwards so filled out as to procure money to be paid upon them at distant post offices. The money so paid was reported to the post-office department, and charged up against the postmaster whose bond is in suit. The amounts paid on these fraudulently issued orders

were prima facie properly chargeable to said postmaster, and the government, through the department, made a proper demand upon him to account for the money paid by the government upon them. In other words, the postmaster at Gladwyne "was accountable" for the amount of money. so demanded. He failed to account, alleging as his excuse therefor the facts and circumstances attending the abstraction of these identical money-order blanks, as hereinbefore set forth. It is to be observed that the facts and circumstances alleged as an excuse for not accounting are put in evidence by the defendant, and do not appear in the plaintiff's case. The question then arose before the court below, and arises before this court, whether the defense thus set up by defendant is good in law.

We say that this question arises here, because, in the view we take of the case, its proper determination will decide the question as to whether the learned judge below erred in his opinion that there was such a variance between the allegation of the plaintiff in his statement of case and the proof as required him to give peremptory instructions to the jury to find for the defendant. This action is ex contractu on the undertaking of the bond, the obligation of which was to become fixed by the want of a faithful performance by the postmaster of the duties imposed upon him by law and regulation. It mattered not whether that breach of duty amounted to a tort or not, the action on the bond was still ex contractu. The government, as plaintiff, in its statement of case, after setting forth the bond and its condition, charged that the said Breen did not faithfully discharge the duties and trusts imposed on him by law and regulation, in that the said Breen "failed, neglected, and refused to account for a large number of money orders of great value, to wit, of the value of $1,103.93, as aforesaid." The plaintiff then averred that, by reason of the premises, the said bond had "become forfeited," and the action had "accrued to the said plaintiff to demand and have from the said defendant the said sum of $1,103.93, with interest as aforesaid," etc. The department's account with Breen showed cash paid by the government, through postmasters in Rhode Island, on 11 money orders, purporting to be issued by Breen, and shown to be upon blank forms intrusted to his safe-keeping, and for use in the money-order business. The department was right in demanding the amount named in these so-called orders from Breen, and, upon his neglect or refusal to account for or pay the same, suit was properly brought by the district attorney for the Eastern district of Pennsylvania to recover the same, and the government sustained its prima facie right to recover by showing, first, a certified copy of the postmaster's bond, and then, under section 889 of the Revised Statutes, a true and correct transcript from the money-order account books of the post-office department, showing the balance of $1,103.93 due the government on August 26, 1893, by reason of certain domestic money orders issued during the month of August, the failure to account, and the demands made upon Breen and sureties, all as hereinbefore set forth. As a defense to this prima facie case, the defendant produced testimony that Breen had never received the amount claimed, or any part thereof, on account of the money orders

or any other account. If, with proof of this fact, Breen had been able to show the 11 blank forms, numbered from 40 to 50, inclusive, received by him from the department, the case of the plaintiff would have been met by a perfect defense. So far from showing this, Breen, by his own testimony and that of his wife, showed that these 11 forms, instead of having been safely kept by him under lock and key, and out of the reach of any unauthorized person, as required by his duty, were actually delivered by his wife, acting as assistant postmaster, to an entirely unauthorized person, fraudulently representing himself as a post-office inspector. The inference was irresistible from these facts that this negligent conduct enabled these orders to be fraudulently imposed upon the Rhode Island postmasters, and the money of the government obtained for the same. This state of things did not excuse Breen from the duty of accounting for these fraudulent orders. To say that it did would permit him and the other defendants in the suits to interpose his negligence as an excuse for not performing his duty to account. There can be no doubt of Breen's responsibility for the negligence of his wife, whom he had placed in the position of assistant postmaster. Breen failed to account for the money obtained through his negligence upon these orders. Under the circumstances, we are of opinion that it was his duty to have so accounted. It would be a casuistry that dealt with shadows and not with substance, to say that these so-called "orders" were not orders at all, because they had been fraudulently issued, and that Breen's name had been forged, and never really signed to them, and that, therefore, no orders, properly so called, were unaccounted for, as alleged in the statement of case. They were paid as orders by the Rhode Island postmasters, charged against Breen as orders, and sufficiently described as orders which had not been accounted for in the statement of case. The words "to account for," as used in the statement of case, are not to be confined in meaning to a settlement for, and payment of, money actually received. By common usage, they may extend to the act of explaining or giving a satisfactory excuse for a given state of things. If the putting out of these money orders, and the fraudulent obtaining of money thereby from the Rhode Island postmasters, could have been explained as due to something else than negligence of Breen, they might have been sufficiently accounted for, and the suit on the bond would have failed.

For the reasons here given, we are of opinion that there was no material variance between the allegation and proof, by which the defendant was surprised. The proofs upon which the averment of variance was founded were introduced by the defendant. There, therefore, could have been no surprise, and the essentials to a fatal variance are wanting. We think, therefore, the learned judge erred in his instructions to the jury, and the judgment below is reversed, and the case remanded, with directions for a new trial.